UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO: 5:06CV-191-R

LEWIS SMITH                                                                                                     PLAINTIFF

v.

EXCEL MAINTENANCE SERVICES, INC.                                                       DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court upon the Defendant Excel Maintenance Services, Inc.'s ("Excel") Motion to Dismiss, or, In the Alternative, for Summary Judgment (Docket #22). The Plaintiff Lewis Smith ("Mr. Smith") has responded (Docket #27) and Excel has replied (Docket #28). This matter is ripe for adjudication. For the following reasons, the Defendant's Motion to Dismiss is **GRANTED** and the Defendant's Motion for Summary Judgment is **DISMISSED as Moot.**

**BACKGROUND**

Mr. Smith began working for Excel as a security officer at the ISP Plant in Calvert City, Kentucky, in February 2005. In October 2005, the Plaintiff "organized other employees for a meeting between the employees of Excel located at the ISP Plant and Excel Management Personnel." The employees signed a formal request that a group meeting be held "to discuss current issues that are affecting job performance and morale." The formal request stated that the meeting had to be held within two weeks and indicated that the signed employees would attend without pay and at no cost to ISP. The formal request also stated that "each employee must be guaranteed that nothing they say can be held against them by an Excel personnel." Mr. Smith's complaint further indicates that the meeting "was to negotiate terms and conditions of

employment and to promote [the employees'] rights and general welfare."

On October 20, 2005, Mr. Smith was terminated, which he alleges was "discriminatory in nature and in retaliation for [his] role in organizing the aforementioned meeting." Mr. Smith alleges his discharge violated KRS 336.130, and that as a result of his termination, he has lost wages and suffered severe emotional distress, embarrassment, and humiliation. Mr. Smith seeks money damages for past pain and suffering, future pain and suffering, lost wages, future medical expenses, and inconvenience. Mr. Smith also seeks punitive damages.

## STANDARD

**1. Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure**

Federal courts are courts of limited subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(h)(3) instructs that "[w]henever it appears by the suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg. Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may attack the complaint on its face or may go beyond the complaint and challenge the factual existence of subject matter jurisdiction. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

The district court is not bound to accept as true the allegations of the complaint as to jurisdiction where a party properly raises a factual question concerning the court's jurisdiction. *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979). The court may look beyond

the jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists. *Id*. (citing *Gibbs v. Buck*, 307 U.S. 66, 72 (1939)).

## 2. Motion for Summary Judgment

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

In its Motion, the Defendant attempts to preempt several possible arguments from the Plaintiff regarding the merits of allowing his claim to proceed under Kentucky law. The Plaintiff raises no new arguments in response, and instead provides only a short rebuttal to each of the Defendant's arguments. The Defendant argues: (1) the Plaintiff's claim is preempted by federal law, and (2) the Kentucky law upon which the Plaintiff rests his claim, KRS 336.130, interferes directly in an area of law that Congress and the Supreme Court have reserved to the National Labor Relations Board (NLRB).

**A. Federal Preemption**

The Plaintiff's only claim is that his discharge was in violation of KRS § 336.130, which provides, in pertinent part:

> (1) Employees may, free from restraint or coercion by the employers or their agents, associate collectively for self-organization and designate collectively representatives of their own choosing to negotiate the terms and conditions of their employment to effectively promote their own rights and general welfare. Employees, collectively and individually, may strike, engage in peaceful picketing, and assemble collectively for peaceful purposes.
>
> (2) Neither employers or their agents nor employees or associations, organizations or groups of employees shall engage or be permitted to engage in unfair or illegal acts or practices or resort to violence, intimidation, threats or coercion.

KRS § 336.130(1)-(2) (2008).

The Defendant argues that the Plaintiff's claim of retaliatory discharge concerns conduct subject to the exclusive jurisdiction of the NLRB. The NLRB has the singular power to resolve disputes arising under the NLRA, 29 U.S.C. § 141 *et seq*. The NLRA protects certain activities in § 7 and prohibits others in § 8. Section 7 states:

> Employees shall have the right to self-organization, to form, join, or assist labor

> organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) [29 USCS § 158(a)(3)].

29 U.S.C. § 157 (2008).  Section 8 states, in pertinent part:

> (a) Unfair labor practices by employer. It shall be an unfair labor practice for an employer--
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157];
>
> (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 [29 USCS § 156], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

29 U.S.C. § 158 (2008).

The Defendant argues that the *Garmon* rule, set forth in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959), applies to the Plaintiff's claim.  In *Garmon*, the Supreme Court held that when an activity is protected under § 7 or prohibited under § 8, or *arguably* protected or prohibited, both the States and the federal courts "must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245.  The Court also stated that even if the NLRB declines to assume jurisdiction over a matter, the States are not "free to regulate activities they would otherwise be precluded from regulating," because "to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." *Id.* at 246.  "The *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA,

but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986).

The Defendant alleges that Mr. Smith's claim concerns conduct arguably protected under § 7 and arguably prohibited by § 8 of the NLRA, and the NLRB therefore has exclusive jurisdiction, even though neither it nor Mr. Smith has filed a complaint with the NLRB. There is certainly no indication or allegation of any union activity in this case. Rather, the Plaintiff his fellow Excel employees simply sought a meeting with their employer to discuss issues affecting job performance and moral and, according to the Plaintiff, "to negotiate terms and conditions of employment and to promote [the employees'] rights and general welfare."

Section 7 of the NLRA provides that employees have the right "...to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection..." Section 8 provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 7. The Plaintiff argues, without citation, that the NLRA only protects union-related activity, and therefore the Defendant cannot argue that his claim for retaliatory discharge is preempted because it concerns conduct arguably protected or prohibited by the Act. However, contrary to the Plaintiff's assertion, the NLRA does not only protect "labor disputes"concerning union activity.

In *NLRB v. Phoenix Mut. Life Ins. Co.*, two insurance salesmen, who had been terminated because they considered writing their employer a letter about the best way to fill a vacant assistant cashier's position at their branch office, sought enforcement of an order of the NLRB that they be reinstated with back pay because the employer engaged in an unfair labor practice

under the NLRA, even though the salesmen were not members of a collective bargaining unit. *Phoenix Mut.*, 167 F.2d 983, 988 (7th Cir. 1948), *cert denied*, 335 U.S. 845 (1948). The Seventh Circuit Court of Appeals reasoned that by incorporating the language in § 7 that "employees shall have the right... to engage in... *concerted activities*, for the purpose of collective bargaining or other mutual aid or protection...Congress must have intended to include within the act what the usual meaning of these unambiguous words conveys." *Id.* (emphasis added). The court held that § 7 should be properly construed to mean that "employees shall have the right to engage in concerted activities for their mutual aid or protection even though no union activity be involved, or collective bargaining be contemplated." Id.

The *Phoenix Mutual* court noted that the salesmen had a valid concern about the identity and capability of the new cashier because the cashier's ability to do his or her job affected their jobs, and as they had no authority to appoint or even recommend the cashier, "they had a legitimate interest in *acting concertedly* in making known their views to management without being discharged for that interest." *Id.* (emphasis added). Further, the conduct of the salesmen "bore a reasonable relation to conditions of their employment." *Id.* The "conditions of employment" language comes from § 2(9) of the NLRA, which defines the term "labor dispute" as including

> any controversy concerning terms, tenure or *conditions of employment*, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

99 U.S.C. § 152 (emphasis added).

The court found that it was an unfair labor practice for the employer to interfere with the salesmen's exercise of the right of "to engage in concerted activities for their mutual aid or

protection." *Id.* In so holding, the *Phoenix Mutual* court essentially identified two requirements for the protection of § 7 to be applied to actions by employees not engaging in any type of union activity: (1) the employees must be engaging in a concerted activity, and (2) the employees' concerted activity must bear a reasonable relation to conditions of their employment.

The United States Supreme Court came to the same conclusion in *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962), where the Court reviewed an order of the NLRB directing the employer to reinstate and make whole seven "wholly unorganized" employees with "no bargaining representative and, in fact, no representative of any kind to present their grievances to their employer." *Washington Aluminum*, 370 U.S. at 14. The employees had been discharged "for leaving their work in the machine shop without permission on claims that the shop was too cold to work in." *Id.* at 10.

The Court determined that the employees' walk-out was a "concerted activity" under § 7 that grew out of a labor dispute as defined in § 2(9). *Id.* at 14-15. The Court stated that employees do not necessarily "lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable" because the "language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made." *Id.* at 14. The Court found that the dispute concerned the employee's conditions of employment because there was a running dispute between the employees and the company "over the heating of the shop on cold days--a dispute which culminated in the decision of the employees to act concertedly in an effort to force the company to improve that condition of their employment." *Id.* at 15-16.

The Sixth Circuit Court of Appeals adopted a similar approach in *Hagopian & Sons, Inc. v. NLRB*, where the employer challenged an order of the NLRB finding, in part, that the employer violated § 8 of the NLRA by discharging four employees for engaging in "concerted activity" protected by § 7. *Hagopian*, 395 F.2d 947, 949 (6th Cir. 1968). Hagopian was a carpet cleaning and installing business; its employees were not organized and had no certified exclusive bargaining representative. *Id*. On two separate occasions, the four primary carpet installers employed by Hagopian walked out over a dispute concerning time-and-a-half pay for overtime and Saturday work. *Id.* at 949-50. After the second walk-out (instigated by an installer named Mason), when the carpet installers attempted to clock back into work, they were not allowed to return and "were informed that as far as Hagopian & Sons was concerned they had voluntarily quit." *Id.* at 950.

The court determined it was clear that Hagopian's decision to terminate the men was motivated at least in part by the two walk-outs, "so if these walk-outs were protected activities, the refusal to reinstate the men was a violation of the Act." *Id.* at 951. In deciding whether the walk-outs were protected activities, the court began with the proposition that "the Act protects '...concerted activities for...mutual aid or protection...' concerning disputes over conditions of employment," citing 29 U.S.C. §§ 157 and 152(9). *Id.* The court then applied the two requirements set forth in *Phoenix Mutual*.

The Court first determined that the second walk-out "was concerted activity for mutual aid and protection" protected by the NLRA,[1] because (1) the walk-out was precipitated by an

---

[1] The court noted that the first walk-out was also protected activity, but because the NLRB did not rely on it in making its decision, the court did the same.

9

argument between one of the installers, Mason, and the Vice President of Operations "concerning the assignment of his helper for the day's work," (2) the argument witnessed by the other three installers who "were aware of the nature of the dispute," and (3) each installer testified that he walked-out "until the matter of assignment of helpers was settled." *Id.* at 950; 951.

The court next stated that it was immaterial in determining whether the activity was protected by the Act "[t]hat no union activity was involved and that Mason was the only one with an immediate stake in the outcome of the dispute." *Id.* at 951. However, the court went on, "to be protected by the Act, the concerted activity in this case must have been directed toward a dispute concerning conditions of employment; so the crucial inquiry is whether the assignment of helpers is a condition of employment." *Id.* The court determined that the dispute did concern conditions of employment. *Id.* at 953. However, the court ultimately denied enforcement of the NLRB's order because the trial examiner had been biased against Hagopian. *Id.*

These cases makes it clear that *Garmon* preemption does not apply only to disputes arising from organized union activity. Instead, "concerted activities" concerning "conditions of employment" by wholly unorganized employees may be protected under § 7,[2] and therefore employers may be prohibited from taking certain actions against those activities under § 8. The Plaintiff alleges he was terminated in retaliation for instigating a meeting request that was joined by multiple other employees. At that meeting, the Plaintiff and other employees wanted to discuss issues affecting job performance and morale, "negotiate terms and conditions of

---

[2]Such activities "may" be protected because § 7 does not protect *all* concerted activities, such as those that are unlawful, violent, or in breach of contract. However, it does not appear that those exceptions apply here.

employment" and promote the employees' "rights and general welfare." If the Plaintiff's allegation that he was terminated in retaliation for requesting this meeting is true, it appears to the Court he is alleging that he was terminated in violation of § 8 for engaging in a concerted activity concerning conditions of employment at least arguably protected by § 7. *Garmon*, 359 U.S. at 245.

It is of no consequence that the Plaintiff did not present his complaint to the NLRB. "When an activity is arguably subject to § 7, or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* An example of this principle in action may be found in *McGlone v. Cintas Corp.*, 1994 U.S. App. LEXIS 24588 (6th Cir. Sept. 8, 1994). Although the *McGlone* facts are different from the case at hand, it provides a clear example of *Garmon* preemption at work in a case alleging a violation of KRS 336.130. *See McGlone*, 1994 U.S. App. LEXIS 24588.

In *McGlone*, the plaintiff first filed an unfair labor practice charge with the NLRB against her former employer, alleging that she was discharged, in violation of § 8, for engaging in union organizing activities. *Id.* at *2. However, when "the NLRB declined to issue a complaint against the employer, finding insufficient evidence that McGlone was discharged for supporting union activities," the plaintiff brought an action in Kentucky circuit court, alleging that her employer "engaged in unfair and illegal acts of intimidation and harassment" and terminated her in retaliation for her union-organizing activities, all in violation of KRS 336.130. *Id.* at *3. Like here, the employer removed the action to federal district court "alleging diversity jurisdiction and original jurisdiction pursuant to the NLRA, " and then moved to dismiss the action, arguing

11

that the "state law claim was preempted by federal labor law, and that the NLRB's refusal to issue a complaint was an unreviewable disposition of the matter." *Id.* at *4.

The court discussed the principles behind *Garmon* preemption and noted that in *Motor Coach Employees v. Lockridge*, 403 U.S. 274 (1971), the Supreme Court

> ...identified three areas in which the courts have made exceptions to the *Garmon* rule: (1) where Congress has affirmatively indicated that judicial power should exist; (2) where the Court cannot presume Congress meant to "intrude so deeply into areas traditionally left to local law"; and (3) where the law is so structured "that judicial supervision will not disserve the interests promoted by the federal labor statutes."

*Id.* at *7 (quoting *Lockridge*, 403 U.S. at 297-98).

The court found that none of these three exceptions applied because (1) the plaintiff proffered no evidence that Congress had affirmatively indicated "that state courts should be empowered to handle claims stemming from an employee's alleged discharge for engaging in union organizing activities;" (2) the conduct at issue was "not of the type that is so deeply rooted in local law that a state court should have concurrent jurisdiction;" and (3) "state judicial supervision of core elements of the employment relationship would disserve the federal interest in uniformity and expert administrative supervision promoted by the federal labor statutes." *Id.* at *9-11 (internal citations omitted).

The *McGlone* court also held that there was no merit to the plaintiff's "argument that her state law claim should remain viable because she is seeking redress not allowed by the NLRA -- personal damages." *Id.* at *11. The remedies available to the NLRB are limited. The NLRB is directed in 29 U.S.C. § 160(c) to tailor remedies that will "effectuate the policies of the NLRA," such as a cease and desist order and reinstatement with or without back pay. The NLRB may not impose punitive sanctions, *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 235-36 (1938), and

it may not order reinstatement or back pay when an employee is suspended or discharged for "cause," 29 U.S.C. § 160(c).

The *McGlone* court analogized the Supreme Court's holding in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987), where the Court,

> in examining the preemptive effect of ERISA on state law claims, observed that the "policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."

*Id.* at *11-12 (quoting *Dedeaux*, 481 U.S. at 54). The court reasoned that to allow the plaintiff "to bring a claim under state law because she is unhappy with the remedies chosen by Congress would undermine the authority of the NLRA and be inconsistent with the doctrine of preemption." *Id.* at 12.

Thus, in *McGlone*, the court found that the fact that the NLRB declined to issue a complaint against the employer for lack of evidence did not remove the plaintiff's alleged retaliatory discharge for engaging in union activities from the realm of activities protected by the NLRA. Even if a plaintiff has no recourse through the NLRB, he or she may not bring a state court action concerning the same activity because "when an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245. According to the *McGlone* court, the remedy sought by a plaintiff has no effect on the viability of state law claim if the activity is subject to preemption because it is protected or prohibited by the NLRA. *McGlone*, 1994 U.S. App. LEXIS 24588, at *11-12.

13

Here, the Plaintiff has presented a retaliatory discharge claim under state law. It appears to the Court that the NLRA preempts the Plaintiff's claim under KRS 336.130 because the NLRA clearly prohibits retaliatory discharges of the nature the Plaintiff alleges. However, the Plaintiff still argues that because he chose to file his original complaint in state court and is seeking money damages, not any type of injunctive relief, his claim is bound by the remedies available under Kentucky law. However, as discussed below, the Defendant argues that Kentucky law does not supplant *Garmon* preemption because the available law on the topic is not controlling, is distinguishable, and/or is wrongly decided.

**B. Kentucky law**

In *Pari-Mutuel Clerks' Union v. Kentucky Jockey Club*, the Kentucky Supreme Court considered "whether an employer over which the National Labor Relations Board has declined jurisdiction may lawfully discharge an employer because he has authorized a labor union to represent him for the purpose of collective bargaining, and, if not, what relief a circuit court is authorized to order in his behalf." *Pari-Mutuel*, 551 S.W.2d 801, 802 (Ky. 1977). Neither party in the case asserted that the action was subject to federal preemption, and the court did not discuss it, because the proceeding involved the horse racing industry, an industry over which the NLRB has traditionally declined to assert jurisdiction. *Id.* The appellant was a starter at a racetrack and was allegedly terminated when he authorized a union to represent him for the purpose of collective bargaining. *Id.* He claimed his termination was "in violation of KRS 336.130 and sought injunctive relief and an award of back pay." *Id.*

The court determined that the appellant's termination was in violation of KRS 336.130 but found that the circuit court could not grant the injunctive relief sought, because while KRS

14

Chapter 336 authorizes the commissioner of the Department of Labor "to intervene in labor disputes at the request of a party for purposes of mediation and conciliation," it does not suggest that state courts have the same authority. *Id.* at 803. If the court granted injunctive relief, it would have to supply provisions "authorizing the courts to order employers to conduct elections for the recognition of collective-bargaining agents, to order that such collective bargaining be conducted, and to order the reinstatement of discharged employees with awards of back pay, along with providing the procedures for enforcement of these orders." *Id.* The court concluded that granting the injunctive relief would amount to rewriting the chapter "making it a state-level equivalent to the National Labor Relations Act," and "legislation is constitutionally the exclusive function of the General Assembly," not the courts. *Id.*

Thus, *Pari-Mutuel* has almost no similarity to the case at hand. Neither party nor the court even considered whether the subject matter was subject to federal preemption. Further, the *Pari-Mutuel* decision was quite specific: the terminated employee sought injunctive relief under KRS 336.130 and the court determined that the language of the statute did not permit state courts to grant such relief.

Almost twenty years later, in another horse racing industry case, *Simpson County Steeplechase Ass'n v. Roberts*, the Kentucky Court of Appeals was faced with an appeal from a judgment of a circuit court "awarding the appellees, former employees of Simpson County Steeplechase, compensatory and punitive damages based upon their alleged wrongful termination as a result of attending a meeting with Pari-Mutuel Clerks Union of Kentucky." *Simpson County Steeplechase*, 898 S.W.2d 523, 524 (Ky. Ct. App. 1995). After meeting with Pari-Mutuel, the racetrack "laid off" a group of clerks that attended the meeting. *Id.* at 525. The

clerks and Pari-Mutuel then filed suit "seeking compensatory and punitive damages as well as injunctive relief." *Id.* The circuit court denied the claims for injunctive relief as a matter of law, and a jury awarded both compensatory and punitive damages.

The Court of Appeals discussed at length, as a matter of first impression, whether punitive damages were available "in a case where termination of an employee occurs because of union activity," concluding that such damages could be awarded. *Id.*; 527. The court in no way discussed federal preemption; the entire opinion is dedicated to a discussion of the award of damages. *See id.* at 524-29. Therefore, *Simpson County Steeplecase* also has no similarity to the case at hand and adds nothing to the Court's consideration of the merits of the Plaintiff's claim that because he chose to file his original complaint in state court and is seeking money damages, not any type of injunctive relief, his claim is bound by the remedies available under Kentucky law.

Recently, in *Gilliam v. Methodist Hosp. of Ky., Inc.*, the Kentucky Court of Appeals vacated the Pike Circuit Court's dismissal, for lack of subject matter jurisdiction, a petition filed by the appellant Gilliam "alleging that he was wrongfully discharged from his employment at appellee's hospital because of his involvement in a labor union's preliminary efforts to organize workers at the hospital." *Gilliam*, 2007 Ky. App. LEXIS 191, at *1 (Ky. Ct. App. June 29, 2007). Like the Plaintiff here, appellant Gilliam alleged that he was wrongfully terminated in violation of KRS 336.130. *Id.* "He claimed damages for lost wages, impaired earning power, harm to his reputation, and past and future pain and suffering. He also sought punitive damages, and costs and attorney's fees." *Id.* at *2.

The circuit court granted the hospital's motion to dismiss for lack of subject matter

jurisdiction finding that the allegations, if true, would violate § 7 and § 8 of the NLRA. *Id.* In so finding, the circuit court noted (1) that the Supreme Court in *Garmon* ruled that the NLRB "has exclusive jurisdiction over matters governed by §§ 7 and 8 of the National Labor Relations Act and state courts must yield to federal jurisdiction and are preempted from acting in such cases;" and (2) that the decision of the Kentucky Supreme Court in *Pari-Mutuel* was inapplicable to the issues raised in the case. *Id.* at \*2-3.

After discussing the circuit court's holding, the Court of Appeals simply cited the text of § 7, § 8, KRS 336.130, and the Supreme Court's holding in *Garmon*, without any discussion of their applicability to the case. *Id.* at \*3-6. The court decided that the *Pari-Mutuel* court actually intended to create a distinction between claims for regulatory and injunctive relief brought under KRS 336.130, because although the *Pari-Mutuel* court determined that KRS 336.130 did not grant a state court authority to grant injunctive relief, it did remand the action to "trial court for further proceedings pertaining to the employee's civil action for wrongful dismissal." *Id*. at \*6. The *Gilliam* court went on to say that his distinction was reaffirmed in *Simpson County Steeplechase* because it had "affirmed the trial court's determination that although it lacked jurisdiction to provide injunctive relief to employees who allegedly were dismissed for attending a union meeting, the employees' compensatory and punitive damage claims for wrongful discharge should be considered by a jury pursuant to KRS 336.130." *Id.* at \*7.

In reaching its decision, the *Gilliam* court failed to note that both *Pari-Mutuel* and *Simpson County Steeplechase* dealt with the horse racing industry, and that federal preemption was never asserted nor discussed in either case, presumably because all parties were aware that the NLRB has traditionally declined jurisdiction over the horse racing industry. The *Gilliam*

decision also seems to indicate that the NLRB's jurisdiction is limited by the remedy sought by the plaintiff, which, as discussed above with *McGlone*, is not the holding of the Sixth Circuit. *McGlone*, 1994 U.S. App. LEXIS 24588, at *11.  The court decided that a claim "for regulatory or injunctive relief would fall within the exclusive jurisdiction of the NLRB pursuant to §§ 7 and 8 of the NLRA," while claims for compensatory and punitive damages based on the alleged violation of KRS 336.130 are not preempted because "such claims do not fall within the 'conduct that is actually or arguably either prohibited or protected by the' NLRA."  *Id.* at *7-8.

The Kentucky Supreme Court recently granted a motion for review of the *Gilliam* decision, *Methodist Hosp. of Ky., Inc. v. Gilliam*, 2008 Ky. LEXIS 87 (Ky. Apr. 16, 2008), and the Defendant suggests staying further proceedings in this action until the court issues a decision in *Gilliam*.  Since it was filed, the *Gilliam* decision has not been cited by any other court and holds no precedential value.  On April 16, 2008, the Defendant filed a notice of a challenge to the constitutionality of KRS 336.130 with the Attorney General of Kentucky.  On May 13, 2008, the Attorney General filed a Notice of Intention Not to Intervene and declined to participate in the defense of the statute.

## C. Conclusion

The Court finds that given the status of binding federal law, the Plaintiff's claim of retaliatory discharge under KRS 336.130 is preempted and must be dismissed for lack of subject matter jurisdiction.  Even should the *Gilliam* decision be binding upon this Court, the Court would not follow the decision in light of the federal caselaw on *Garmon* preemption that is so clearly in line with this case.

This Court has no subject matter jurisdiction over the Plaintiff's claim, as the NLRA

clearly prohibits retaliatory discharges of the nature the Plaintiff alleges. The Plaintiff's claim concerns a "concerted activity" concerning "conditions of employment" protected, or arguably protected, under § 7. Therefore, if the Plaintiff's allegations of retaliatory discharge are true, the Defendant's actions would be prohibited by § 8. It is entirely without consequence that the Plaintiff and his fellow employees were not engaging in union activity. Therefore, this Court "must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is **GRANTED** and the Defendant's Motion for Summary Judgment is **DISMISSED as Moot.**

An appropriate order shall issue.